IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TERENCE C. ATKINS,
      Petitioner,

vs.                                Case No.: 3:06cv87/MCR/EMT

JAMES R. McDONOUGH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1).  Respondent filed an answer and relevant portions of the state court record (Doc. 12).  Petitioner filed a reply and supplemental authority (Docs. 17, 18, 23).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The procedural background of this case is undisputed by the parties and established by the state court record.  Following a jury trial in the Circuit Court for Okaloosa County, Florida, on February 12–13, 2001, Petitioner was convicted of arson of an occupied dwelling (Doc. 12, Exs. B, C).  He was sentenced on March 19, 2001, to a term of twelve (12) years of imprisonment (*id*., Exs. D, E).  Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA) (*id.*, Ex. F).  Petitioner's appellate counsel filed a brief asserting that counsel was

unable to make a good faith argument that reversible error occurred in the trial court, in accordance with <u>Anders v. California</u>, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967) (*id.*, Ex. G). Petitioner filed a pro se initial brief (*id.*, Ex. H). The appellate court affirmed the conviction and sentence per curiam on July 31, 2002 (*id.*, Ex. J). <u>Atkins v. State</u>, 827 So. 2d 1019 (Fla. 1st DCA July 31, 2002). Petitioner filed a motion for rehearing, which was denied on October 16, 2002 (Doc. 12, Ex. J). The First DCA issued a mandate in the case on November 1, 2002 (*id.*).

On July 15, 2002, while Petitioner's direct appeal was pending, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 12, Ex. K). The trial court denied the motion for lack of jurisdiction on the ground that the direct appeal was pending (*id.*, Ex. L). Petitioner appealed the decision to the First DCA, but the appellate court dismissed the appeal on November 4, 2002, pursuant to Rule 9.350(b) of the Florida Rules of Appellate Procedure (governing voluntary dismissal of proceedings) (*id.*, Ex. N).

On December 23, 2002, Petitioner filed a motion for modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Doc. 12, Ex. O). The trial court denied the motion as untimely on January 16, 2003 (*id.*; *see also* Ex. R). Petitioner sought appellate review of the decision (*id.*, Ex. P). On July 31, 2003, the First DCA issued a written opinion vacating the lower court's decision and remanding the case for a merits review of the Rule 3.800(c) motion (*id.*, Ex. R). <u>Atkins v. State</u>, 851 So. 2d 829 (Fla. 1st DCA July 31, 2003). The trial court considered the merits of Petitioner's motion and denied the motion on September 15, 2003 (id., Ex. O). Petitioner did not appeal the decision.

On September 23, 2003, Petitioner filed a second Rule 3.850 motion (Doc. 12, Ex. T at 1–6). Following an evidentiary hearing at which Petitioner was represented by counsel (*see id.*, Ex. V), the trial court denied the motion in a written opinion rendered on January 10, 2005 (*id.*, Ex. W). Petitioner appealed the decision to the First DCA (*id.*, Exs. X, Y), and the appellate court affirmed the decision per curiam without written opinion on December 13, 2005, with the mandate issuing January 30, 2006 (*id.*, Ex. AA). <u>Atkins v. State</u>, 918 So. 2d 294 (Fla. 1st DCA Dec. 13, 2005) (Table).

Petitioner filed the instant habeas action on February 27, 2006 (Doc. 1 at 6). Respondent concedes that the petition is timely (Doc. 12 at 6).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as

---

[1] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> determined by the Supreme Court of the United States."  Under the "contrary to"
> clause, a federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this court on a question of law or if the state
> court decides a case differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court identifies the correct governing
> legal principle from this Court's decisions but unreasonably applies that principle to
> the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261

F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." *Id.* (citing and quoting <u>Williams</u>, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  <u>Bell v. Cone</u>, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting <u>Williams</u>, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error."  <u>Williams</u>, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations."  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.  <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence."  § 2254(e)(1); *see* <u>Miller-El v. Cockrell,</u> 537 U.S. 322, 123 S.

Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. See Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

III.     EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S.

---

[2]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
            (A)  the applicant has exhausted the remedies available in the courts of the State; or
            (B) (i)  there is an absence of available State corrective process; or
                 (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

      The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.* at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

      Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Id.* (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.* at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

      Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364 (1995).  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state

court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  *Id.* at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

---

[3]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

[4]In  his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  *Id.*  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement

---

[5]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1301–02 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

A petitioner can overcome a procedural default in two narrow circumstances.  The petitioner must either show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Henderson v. Haley, 353 F.3d 880, 892 (11th Cir. 2003); Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  Furthermore, the Eleventh Circuit has held that because there is no constitutional right to an attorney in state post-conviction proceedings, any ineffectiveness of post-conviction counsel cannot be "considered cause for the purposes of excusing . . . procedural default that occur[s] . . . at the state collateral post-conviction level."  Henderson, 353 F.3d 892 (citing 28. U.S.C. § 2254(i); Coleman v. Thompson, 501 U.S. 722, 752 (1991); In re Magwood, 113 F.3d 1544, 1551 (11th Cir. 1997); Johnson v. Singletary, 938 F.2d 1166, 1174–75 (11th Cir. 1991)).  To establish prejudice, a petitioner must show that there is "at least a reasonable probability that the result of the proceeding would have been different."  *Id.*

Alternatively, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further,

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

    A.    <u>Ground One:  Ineffective assistance of counsel—failure to object to jury instructions.</u>
(Doc. 1 at 4).  Petitioner claims that his trial counsel performed ineffectively by failing to object to
the jury instructions on the arson charge on the ground that the oral and written instructions stated
the State must prove "the following three elements," but then listed the four elements of arson (*id.*;
attached supporting memorandum at 3–5).  Petitioner contends there is a reasonable probability that
the outcome of trial would have been different if counsel had objected to the instruction (*id.* at 5).
Petitioner also appears to argue that the trial court violated his due process rights by erroneously
instructing the jury that there were three elements of arson (Doc. 1, supporting memorandum at
2–8).   As to the ineffective assistance of counsel claim, Respondent concedes that Petitioner
exhausted the claim in the state courts (Doc. 12 at 10).  Respondent contends that Petitioner is not
entitled to federal habeas relief on this claim because the state court decision was not contrary to or
an unreasonable application of Supreme Court law, nor was the decision based upon an unreasonable
determination of the facts (*id.* at 12–15).  To the extent Petitioner also raises a due process claim,
Respondent argues that Petitioner did not fairly present the issue to the state courts, thus the claim
was not exhausted (*id.* at 10–11).  Furthermore, Petitioner cannot now file a second direct appeal
to properly raise the due process issue in state court; therefore, the claim is procedurally barred
under state law and procedurally defaulted for purposes of federal habeas review (*id.*).  Moreover,
Petitioner has not shown cause for his failure to fairly present his federal claim to the state courts;
therefore, he is not entitled to federal review of his claim (*id.* at 11).

        1.    Clearly Established Supreme Court Law

    The standard for evaluating claims of ineffective assistance of counsel is set forth in
<u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief
under <u>Strickland</u>, a petitioner must show (1) deficient performance by counsel and (2) a reasonable
probability that, but for counsel's deficient performance, the result of the proceeding would have
been different.  466 U.S. at 687–88.  It is the petitioner's burden to prove, by a preponderance of the
evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result
thereof.  *Id.* at 687.  If a petitioner fails to make a showing as to either performance or prejudice, he
is not entitled to relief.  *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf.* Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See* Michel v. Louisiana, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Strickland, 466 U.S. at 693.  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will

have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

> 2.      Federal Review of State Court Decision

Petitioner raised his ineffective assistance of counsel claim as his first ground for relief in his amended Rule 3.850 motion (Doc. 12, Ex. U1 at 13).  The state court's written opinion identified the <u>Strickland</u> standard as the applicable standard for evaluating claims of ineffective assistance of counsel (*id.*, Ex. W at 1).  The state court found as fact that the jury instruction given at Petitioner's trial regarding arson of an occupied structure was the following:

> [b]efore you can find the defendant guilty of arson to an occupied dwelling, the state must prove the following three elements beyond a reasonable doubt.  First, that Terrence Atkins damaged or caused to be damaged 31C Alder Avenue, Fort Walton Beach, Florida, by fire.  Second, the damage done to 31C Alder Avenue, Fort Walton Beach, Florida was done willfully and unlawfully.  Three, the structure was a dwelling.  Four, the defendant knew or had reasonable grounds to believe the dwelling at 31C Alder Avenue was occupied by a human being.

(Doc. 12, Ex. W at 4–5).  The state court also found as fact that Petitioner did not allege in his amended Rule 3.850 motion that the instructions as given failed to include an essential element of the crime charged, nor did he allege that the substance of the instructions given to the jury were inaccurate; rather, his argument was that a new trial should be granted because defense counsel did not object when the court stated there were three elements that must be proved and then read the actual four elements to the jury (*id*. at 5).  The state court found as fact that the court mistakenly told the jury that the State was required to prove the "following three elements" when there were actually four, but the state court concluded that the error was harmless (*id*.).  The state court then concluded that because Petitioner failed to show that there was a reasonable probability that counsel's failure

to object to the instruction affected the outcome of trial, he failed to establish that he received ineffective assistance of counsel (*id.*).

As previously noted, the state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel.  Additionally, the state court's factual findings are presumed correct as Petitioner has failed to rebut those findings with clear and convincing evidence.   Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

Petitioner argued in the state court and this court that the mistake in the jury instructions lowered the State's burden of proof by instructing the jury that the State was required to prove only three of the four elements of arson in order to convict Petitioner (Doc. 1 at 5; Doc. 12, Ex. U2 at 5).

The state court record and Petitioner's submissions confirm that both the oral and written jury instructions included the following instruction on arson of an occupied dwelling:

> Before you can find the defendant guilty of arson to an occupied dwelling, the state must prove the following three elements beyond a reasonable doubt.  First, that Terrence Atkins damaged or caused to be damaged 31C Alder Avenue, Fort Walton Beach, Florida, by fire.  Second, the damage done to 31C Alder Avenue, Fort Walton Beach, Florida was done willfully and unlawfully.  Three, the structure was a dwelling.  Four, the defendant knew or had reasonable grounds to believe the dwelling at 31C Alder Avenue was occupied by a human being.

(Doc. 1, Ex. C; Doc. 12, Ex. B at 299).  The record also indicates that the written instructions were provided to the jury during deliberations (*see* Doc. 12, Ex. B at 309).  The instruction obviously contained a misstatement; however, Petitioner has failed to demonstrate a reasonable probability that the outcome of his trial would have been different if counsel had objected to the instruction.  The misstatement in the instruction did not mischaracterize any of the four elements of the offense; it did not omit any of the four elements; it did not preclude the jury from making a finding on the actual elements; and it did not state that the jury could find Petitioner guilty if the State proved only three of the four elements that followed.  If counsel had objected to the instruction, the court would have instructed the jury that before Petitioner could be found guilty of arson to an occupied dwelling, the State must prove the following four elements beyond a reasonable doubt, then the court would have repeated the same elements contained in the instruction that was actually given, and the jury would have considered whether evidence was adduced at trial to prove each element beyond a reasonable

doubt.  Unlike the case of Everett v. Beard, 290 F.3d 500 (3d Cir. 2002), which Petitioner cites in support of his claim, the prosecutor in Petitioner's case presented evidence to satisfy the four elements of arson of an occupied dwelling.[6]  Kathie Atkins, Petitioner's former wife, testified that she lived at 31C Alder Avenue, an apartment complex with ten apartments, at the time of the fire on October 3, 1999, and Petitioner had lived there with her from November of 1997 to August of 1999 (Doc. 12, Ex. B at 20, 39).  Ms. Atkins testified that from June to August of 1999, Petitioner threatened to kill her while they were living at the apartment (id. at 28–36).  Even after Petitioner was escorted out of the home by police, he continued to threaten her later in the month of August (id. at 36–37).  Ms. Atkins testified that she had driven the same car since 1988, she normally parked her car directly in front of her apartment, and Petitioner had driven and been a passenger in her vehicle (id. at 22–23).  She testified that she parked her car directly in front of her apartment in the early morning hours of October 3, 1999, and went to bed (id. at 21–23).  She was awakened by her smoke alarm, observed smoke in the apartment, went to the window and observed flames coming up the wall, and jumped out of the window to safety (id. at 23–24).  Ms. Atkins testified that she did not own an outdoor grill; one of her neighbors kept a gas grill outdoors; and she was not aware of any charcoal grills that were kept outside the building (id. at 27–28).  She also testified that Petitioner worked at a convenience store for approximately one month in 1998 (id. at 49).

The battalion chief of the local fire department testified that the fire may have been started around 5:00 a.m. or shortly before (id. at 50, 52).  He testified that he did not observe evidence of a delayed ignition device (id. at 55).  An investigator with the state fire marshal's office testified that he did not observe any signs of an accidental cause of the fire (id. at 59, 61).  He also testified that the fire started on the outside of the house (id. at 64).  He testified that he took samples from dirt and concrete outside the house because they indicated the presence of a flammable liquid (id. at 64–67).  He also testified that while he was investigating the scene, he detected the odor of charcoal lighter

---

[6]In Everett, the Third Circuit did not apply the AEDPA's deferential standard to the state court decision, and the case was subsequently abrogated on that ground, see Priester v. Vaughn, 382 F.3d 394 (3d Cir. 2004).  Furthermore, in Everett, the Third Circuit found that the habeas petitioner was prejudiced by his counsel's failure to object to a jury instruction that incorrectly relieved the state of proving that the petitioner possessed the requisite intent to kill the victim because there was no evidence adduced at trial that the petitioner possessed the requisite intent, and the prosecutor's trial strategy, evidenced by his closing remarks, was based on the erroneous premise that the petitioner could be convicted based upon accomplice liability without evidence of his specific intent to kill the victim and based on the specific intent of the actual killers.  See Everett, 290 F.3d at 515.

fluid (*id.* at 67).  The investigator testified that he discovered a can of charcoal lighter fluid discarded in a city trash can near unit 31C, and the can appeared to be fairly new as it was not rusted or dented (*id.* at 68–69, 71).  He collected the can as evidence (*id.*).  The investigator further testified that he took Petitioner to the sheriff's office and obtained his fingerprints (*id.* at 73–74).  On cross-examination, the investigator testified that he observed two containers of charcoal lighter fluid next to grills three or four units away from 31C (*id.* at 78–79).  A crime lab analyst for the state fire marshal testified that he tested the samples from the dirt and concrete, as well as liquid collected from the can, and found an ignitable liquid (*id.* at 105–10).  A crime lab analyst in the latent fingerprint section for the Florida Department of Law Enforcement testified that she developed seven latent fingerprints from the charcoal lighter can recovered from the scene, and six of the fingerprints were Petitioner's (*id.* at 145, 149).

The owner of the trash can testified that she did not use charcoal lighter fluid (*id.* at 100–01).  She also testified that the trash was collected on the Monday prior to the fire (id. at 102–03).

Robert Gray testified that he had been previously convicted approximately 16–19 times (*id.* at 114–15).  He testified that on numerous occasions from 1988 to 2001, he was paid cash by law enforcement in the total amount of $150–200 in exchange for information (*id.* at 114–15).  Mr. Gray testified that although he had requested benefits in the form of leniency in the judicial system in exchange for providing information to law enforcement, he never received anything (*id.* at 115).  He also testified that the prosecutor's office had not offered him any benefit for his testimony in Petitioner's case (*id.* at 116, 123–24).  Mr. Gray testified that he was incarcerated in the Okaloosa County Jail when Petitioner was also incarcerated there (*id.* at 124).  He testified that Petitioner told him that on the night of the fire, he and his cousin Mike Murphy left a party at the Knights of Columbus and went to the apartment complex where Petitioner's ex-wife lived, (*id.* at 125–27).  Petitioner told him he exited Mike's car with a can of lighter fluid, sprayed fluid around the air conditioner duct, lit the fluid, and threw the can in a trash can or dumpster, then rushed back to the Knights of Columbus (*id.* at 126).

The defense presented evidence that Petitioner was seen leaving the Knights of Columbus between 3:00 and 4:00 the morning of the fire (*id.* at 158, 162).  Another witness, Lorenzo Murphy, testified that he arrived at his mother's home at 206 Shirley Avenue at 4:55–5:00 a.m. on the

morning of the fire, and Petitioner arrived at the house at approximately 5:00 a.m. and left 5–10 minutes later with a female (*id.* at 169, 172–73).  He testified that prior to arriving home, he ate barbeque at his brother's, Michael Murphy's, house (*id.* at 170–72), and Petitioner was also there (*id.* at 171–72).  He testified that his brother and Petitioner had cooked earlier, and his brother owned a charcoal grill (*id.* at 177–78).

Mike Murphy testified that Petitioner left his house at approximately 4:45 a.m. on the morning of the fire and walked to Murphy's mother's house, which typically took approximately 18 minutes (*id.* at 182–86).  He admitted he had cooked barbeque that evening and had a charcoal grill (*id.* at 188).  He also admitted that during his previous deposition, he testified that Petitioner left his house at 4:30 a.m. (*id.* at 189–90).

Mamie Murphy, mother of Lorenzo and Michael Murphy, testified that Petitioner arrived at her house at 5:05 a.m. the morning of the fire (*id.* at 208, 210).

Kim Alloway testified that the morning of the fire, she received a page from Petitioner between 4:30 and 5:00 a.m., she waited 5–10 minutes, drove to a pay phone and called him (*id.* at 219, 221–22).  She then returned home and drove to Ms. Murphy's house, arriving there at 5:00 or 5:15 a.m. (*id.* at 223–24).  She and Petitioner left Ms. Murphy's house and went back to her house (*id.* at 224).

Petitioner testified he had four prior felony convictions for bad checks, one conviction for uttering a bad check, and one conviction for grand theft (*id.* at 235).  He explained the presence of his fingerprints on the lighter fluid can by stating that in late August or early September of 1999, he went to his ex-wife's house to see if his belongings were still there and grabbed several cans, grills, and bottles to move them out of the way so he could get to the back of the apartment (*id.* at 236).  He also testified that during the two years that he lived at the apartment he would sit and talk with a neighbor who had a grill (*id.* at 237).  He testified he had worked for a convenience store near the apartment building (*id.* at 240).  He admitted he spoke with Robert Gray when the two of them were incarcerated, but denied that he told Mr. Gray anything about the fire (*id.* at 241–42).  Petitioner testified that he arrived at Ms. Murphy's house at 5:10 a.m. (*id.* at 245).  On direct examination, Petitioner denied that he threatened to kill his ex-wife, but on cross-examination, he admitted he told her he would kill her if he caught her with another man in the house (*id.* at 246, 251–52).

       In the state post-conviction proceeding and the instant proceeding, Petitioner failed to allege the existence of any evidence showing that any of the jurors believed they could convict Petitioner without the State proving all four elements beyond a reasonable doubt, or that any of the jurors were confused as to whether the State was required to prove all four elements (the undersigned notes that the jury did not request clarification of the arson instruction during deliberations).  Furthermore, the misstatement in the jury instruction did not mischaracterize or omit an essential element of the arson charge.  Moreover, if defense counsel had objected to the instruction, there was ample evidence adduced at trial to satisfy each of the four elements of arson; therefore, Petitioner failed to demonstrate a reasonable probability that the result of his trial would have been different if counsel had objected to the instruction.  In light of these conclusions, the state court decision denying Petitioner's claim on the ground that Petitioner failed to satisfy the prejudice prong of Strickland was not unreasonable.

       To the extent Petitioner attempts to raise a due process claim based upon the misstatement in the jury instruction, the undersigned agrees with Respondent that Petitioner failed to present this claim to the state courts.  Under Florida law, issues of erroneous jury instructions are properly raised on direct appeal of the conviction.  See Floyd v. State, 808 So. 2d 175, 181, nn.8, 9 (Fla. 2002). Furthermore, Florida courts consistently apply the procedural rule that issues that could or should have been raised on direct appeal are procedurally barred from collateral review.  Florida courts also regularly follow the procedural rule that a second Rule 3.850 motion is subject to dismissal if it raises new and different grounds that could have and should have been raised in the movant's first Rule 3.850 motion.  See Fla. R. Crim. P. 3.850(f); see also Frazier v. State, 898 So. 2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); Washington v. State, 876 So. 2d 1233, 1234 (Fla. 5th DCA 2004) (same).  In the instant case, the only issue that Petitioner raised on direct appeal of his conviction was trial court error in denying defense counsel's motion for judgment of acquittal (see Doc. 12, Ex. H), thus he did not raise the due process claim with regard to the jury instruction even though he could have.  Furthermore, even if his due process claim could have been raised in a Rule 3.850 motion, an attempt to now raise it in a second Rule 3.850 motion would properly be barred

as successive.  Therefore, to the extent Petitioner asserts that the jury instruction constituted a due process violation, he procedurally defaulted the claim.

Petitioner does not allege cause for his failure to present the issue on direct appeal. Additionally, Petitioner has failed to establish a fundamental miscarriage of justice through a colorable showing of actual innocence.  Although he argues he is legally innocent of the charge by virtue of the misstatement in the jury instruction, this does not satisfy the requisite showing of factual innocence necessary to obtain review through the fundamental miscarriage of justice exception.  Furthermore, although Petitioner asserts in Ground Two of the instant petition that he has obtained newly discovered evidence, specifically, the testimony of a fellow inmate who told him that Robert Gray admitted to him that he gave false testimony at Petitioner's trial, this evidence does not constitute a colorable showing of Petitioner's factual innocence of the arson.  Petitioner states that during his trial, the State presented the following evidence to support a conviction for arson: (1) testimony of Petitioner's ex-wife that Petitioner threatened her, (2) evidence that a can of lighter fluid with Petitioner's fingerprints was found near the fire, and (3) testimony of Robert Gray that Petitioner confessed to the arson (Doc. 1, attached supporting memorandum at 8–9).  Petitioner states that at the evidentiary hearing on his Rule 3.850 motion, Mr. Billouin, an acquaintance of Mr. Gray, testified that Mr. Gray told him in September of 2004 that he gave perjured testimony in Petitioner's trial, and Mr. Gray relayed this to him (Mr. Billouin) as a lesson on how to beat the legal system  (*id*. at 9).  Petitioner asserts that the credibility of Mr. Billouin's testimony is established by the fact that when Billouin was arrested in September of 2004, he falsely identified himself to police as Terrence C. Atkins, thus corroborating Billouin's assertions that he heard about Petitioner from Mr. Gray (*id*.; Doc. 17 at 3).  Petitioner contends if the jury had know that Mr. Gray's testimony was false, the jury would most likely have acquitted Petitioner of the arson charge because the remaining evidence was insufficient to sustain a conviction (*id*. at 10).

Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him if the jury had heard Mr. Billouin's testimony.  At the evidentiary hearing in the Rule 3.850 proceeding, Mr. Billouin testified as follows:

> Q [by Petitioner's counsel].  Did you ever have any occasion to have discussions with Mr. Gray about his interactions with local police?

A.      Yes, sir.

Q.      What was the substance of those conversations?

A.      How to deceive; how to lie and get—cheat out of time; and how to frame.  Basically, that was it.

Q.      How to frame other people?

A.      Yes, sir.

Q.      Did he ever give you any examples?

A.      He gave me one example, yes, sir.

Q.      Okay.  And what was that example?

A.      The example was pertaining to a Terrence C. Atkins, sir.

Q.      Okay.  And at the time that you had this conversation, you had no—you didn't know who Terrence Atkins was?

A.      No, sir.  I thought it was just a name that just came up out of the blue; just a for instance.

Q.      Okay.  Can you tell me how he framed Mr. Atkins?

A.      Yes, sir.  He said he lied on him in court and that got him off of some time, and—well, what—he was about to be doing some time and he made a deal with the State.
. . . .

Q.      And you're quite certain that Mr. Robert Gray told you that he framed Terrence Atkins?

A.      Yes, sir.

Q.      Did he say that part of this frame included testimony in court?

A.      Yes, sir.

Q.      Did he tell you why he did it?

A.      To get out of jail.  He didn't—he didn't like being locked up.

. . . .

CROSS-EXAMINATION

BY MR. BISHOP:

. . . .

Q.      You're currently incarcerated at this time; is that right, Mr. Billouin?

A.      Yes, sir.

Q.      In the Okaloosa County jail?

A.      Yes, sir.

Q.      Been there about two or three weeks?

A.      No, sir.  I've been there since September the 20th, sir.

Q.      And you met Mr. Atkins in the Okaloosa County jail; is that your testimony?

A.      Yes, sir.

Q.      But it is true that at the time that you were arrested on the charges that you have pending against you now, you in fact used the name of Terrence Atkins in an attempt to get away from the police?

A.      Yes, sir.

Q.      Okay.  And it's your testimony that you just used that name because why?

A.      Well, because I heard Robert say it.  But the main thing was is [sic] that I thought at the time it was just a fictitious name, sir.

Q.      So you used that name, though, with the police?

A.      Yes, sir.  I tried to give—I tried to give a fake Social Security number.

. . . .

Q.      And how was it that you came to discuss with him [Robert Gray] Mr. Atkins' case?

A.      At the time, I didn't know he was talking about a person in particular; I thought he was just making up a name, sir.  We were just—he was just talking

about guys that were accusing him of doing things and then he just brought up a story, sir.

Q.      He brought up a story?

A.      Yes, sir.

Q.      All right.  And what exactly did he tell you?

A.      Well, he said that if you were ever in trouble, if you ever had—if you were ever in trouble and you ever had to get out of doing a lot of time, you can make up a story on somebody, lie to 'em, get with the state's attorney and use them as state's evidence.

Q.      And did he use the word "lie"?

A.      Yes, sir.

Q.      Mr. Billouin?

A.      Yes, sir.

Q.      And did he specifically say that he'd lied about Mr. Atkins' case?

A.      No, sir.  He specifically said that you could lie.

Q.      So he never said that he had lied in Mr. Atkins' case?

A.      He used the name Mr. Atkins.  But at the time I thought it was a fictitious name, sir.

Q.      Mr. question to you, Mr. Billouin, is, is that Mr. Gray never told you that he lied in a case against Terrence Atkins?

A.      He lied in a case and he used Terrence Atkins' name, sir.

Q.      That's what I'm asking.  That's what your testimony is is that he specifically mentioned Terrence Atkins' case?

A.      Yes, sir.

Q.      Okay.  Where were you at when that conversation took place?

A.      In his car.

Q.      And did he say what it was that he lied about?

A.      No, sir.

Q.      Did he say what it was that—I think you earlier testified that he had made a deal with the State?

A.      Rephrase the question, sir?

Q.      Earlier you testified that he told you that he had made a deal with the State to testify against Mr. Atkins?

A.      Is that exactly what I said?

Q.      I'm asking you.  That's what—just a couple of moments ago we asked you and you said he'd made a deal with the State.

A.      I don't think that's the way I phrased it, sir.

Q.      Well, you tell me what it is he said then, Mr. Billouin.  What did he tell you about the deal that he made?

A.      He said you could make a deal with the State, sir.

Q.      But he never said that he did in Mr. Atkins' case?

A.      No, sir.

Q.      Did he ever specifically say that he got out of any time as a result of testifying against Mr. Atkins?

A.      No, sir.

Q.      Okay.  And he never was specific as to how he supposedly lied in the case against Mr. Atkins?

A.      No, sir.

(Doc. 12, Ex. V at 63–70).  Robert Gray also testified at the evidentiary hearing.  He testified that his testimony in Petitioner's case was true and correct and that he had not discussed his testimony with anyone since the trial (*id*. at 80–82).  He also testified that he had employed Mr. Billouin in

September of 2004, but he never discussed Terrence Atkins or the fact that he testified against Mr. Atkins with Mr. Billouin (*id*. at 82).

The only value of Mr. Billouin's testimony would have been to impeach Mr. Gray's testimony; however, the impeachment value of his testimony would have been minimal as his testimony was at best inconsistent and his credibility questionable. Mr. Billouin first testified that Mr. Gray told him he lied about Petitioner during his testimony in Petitioner's case and received a benefit in his own criminal case; but on cross-examination he stated Mr. Gray told him he lied in a case and he used Terrence Atkins' name, that Mr. Gray said a person could make a deal with the State, but he never said that he did in Mr. Atkins' case, that Mr. Gray never specifically said that he got out of any jail time as a result of testifying against Mr. Atkins, and that Mr. Gray was never specific as to how he supposedly lied in Petitioner's case. Furthermore, the fact that Mr. Billouin admitted he gave a false name and social security number to police when he was arrested diminished his credibility as a witness. In light of the questionable consistency and credibility of Mr. Billouin's testimony, Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him if the jury had heard Mr. Billouin's testimony. Therefore, he failed to show he is entitled to review of his due process claim through the fundamental miscarriage of justice exception to the procedural bar.

As Petitioner is no longer able to present the due process claim to the state courts, and he has failed to show the requisite cause to excuse his procedural default or satisfy the fundamental miscarriage of justice exception to the procedural bar, this claim is barred from federal habeas review.

B.    <u>Ground Two: Newly discovered evidence.</u>

(Doc. 1 at 4). Petitioner contends that if the jury had heard Mr. Bullion's testimony that Mr. Gray told him he gave perjured testimony at Petitioner's trial, the jury would most likely have acquitted Petitioner of the arson charge because the remaining evidence was insufficient to sustain a conviction. To the extent Petitioner is asserting a freestanding claim of actual innocence based upon the newly discovered evidence of Mr. Bullion's testimony, his claim is not cognizable on federal habeas review. Neither the Supreme Court nor the Eleventh Circuit has recognized a freestanding claim of actual innocence in federal habeas corpus. *See* <u>Herrera v. Collins</u>, 506 U.S. 390 at 417, 113

S. Ct. 853, 122 L. Ed. 2d 203  (1993) (assuming, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."); House v. Bell, --- U.S. ---, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (declining to resolve the issue left open in Herrera whether freestanding innocence claims are cognizable in federal habeas).

Although a habeas petitioner may assert innocence as a gateway to obtain federal review of procedurally defaulted claims, Petitioner failed to satisfy his burden under Schlup as discussed *supra*, therefore, he is not entitled to a review of his newly discovered evidence under the actual innocence exception to the procedural bar.

Accordingly, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 3<u>rd</u> day of April 2007.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**